```
 1                 UNITED STATES BANKRUPTCY COURT
                   EASTERN DISTRICT OF OKLAHOMA
 2

 3   ------------------------------------X
                                         :   11-81817 (TRC)
 4   In Re:                              :
                                         :   111 West 4th Street
 5       CHARLES D. RIDLEY,              :   Okmulgee, Oklahoma
                                         :
 6                                       :   February 16, 2017
                             Debtor.     :
 7   ------------------------------------X
     RIDLEY,                             :
 8                                       :
                          Plaintiff,     :
 9                                       :
                 v.                      :   16-08008
10                                       :
     M&T BANK,                           :
11                                       :
                          Defendant.     :
12   ------------------------------------X

13                    TRANSCRIPT OF TRIAL
                BEFORE THE HONORABLE TOM R. CORNISH
14                UNITED STATES BANKRUPTCY JUDGE

15   APPEARANCES:

16   For the Plaintiff:          GREGORY T. COLPITTS, ESQ.
                                 The Colpitts Law Firm
17                               6506 South Lewis
                                 Suite #175
18                               Tulsa, Oklahoma 75136-1079

19   For the Defendant:          MATTHEW J. HUDSPETH, ESQ.
                                 Baer & Timberlake, P.C.
20                               4200 Perimeter Center
                                 Suite #100
21                               Oklahoma City, Oklahoma 73102

22   Court Transcriber:          RUTH ANN HAGER, C.E.T.**D-641
                                 TypeWrite Word Processing Service
23                               211 N. Milton Road
                                 Saratoga Springs, New York 12866
24

25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
```

EXHIBIT

B

```
 1                                                                    2

 2

 3                          I N D E X

 4
        WITNESSES                    DIRECT  CROSS  REDIRECT RECROSS
 5
        CHARLES DALE RIDLEY
 6        By Mr. Colpitts              5
          By Mr. Hudspeth                     27
 7
        JEREMY KIRSH
 8        By Mr. Colpitts             31             38
          By Mr. Hudspeth                    34              44
 9
        SAMANTHA THOMAS
10        By Mr. Colpitts             48             61
          By Mr. Hudspeth                    58              62
11
12      Exhibits        Description              Ident.  Evid.

13      1               Mortgage Note, 7-14-2002      3      3
        2               Mortgage, 7-15-2015           3      3
14      3               Notice of Bankrupt            3      3
        4               Discharge                     3      3
15      5, 6            Notice Final Cure, M&T Bank   3      3
        7               Customer Account Activity     3      3
16      8, 9            Transfer of Mortgage Claim    3      3
        10              Amortization, 4-20-2016       3      3
17      11              POC #7 JPMorgan Chase Bank    3      3
        12-15           Notice of Payment Change      3      3
18      16              Chapter 13 Plan Amended       3      3
        17              Chapter 13 Plan Summary       3      3
19      18              Confirmation Order            3      3
        19              Letter of Default             3      3
20      21-35           Payments, 2015-2017           3      3
        40              Escrow Analysis, 12-14-2016   3      3
21      41-60           Statements, 2016-2017         3      3
        61              2016 IRS Form 1098            3      3
22      62              Billing Statement, Colpitts Law Firm 3      3

23

24

25
```

1  (Proceedings began at 9:31 a.m.)

2         THE CLERK:  All rise.  The United States Bankruptcy

3  Court of the Eastern District of Oklahoma is now in session,

4  the Honorable Tom R. Cornish presiding.

5         THE COURT:  Got it?  Anyway, have a seat.  I'm having

6  a little issue with my body this morning, so that should serve

7  as an admonishment -- I want to go off the record just a

8  second.

9  (Off the record at 9:31 a.m.)

10         THE COURT:  The plaintiff's file exhibit list,

11  Mr. Hudspeth, have you had a chance to review those?

12         MR. HUDSPETH:  Yes, Your Honor.

13         THE COURT:  Do you have any objections to those?

14         MR. HUDSPETH:  No, Your Honor.

15         THE COURT:  Okay.  What about his exhibits?

16         MR. COLPITTS:  He's adopted our exhibits so, Your

17  Honor, we would move for the admission of the plaintiff's

18  exhibits.

19         THE COURT:  Does he have any -- do you have any

20  exhibits of your own?

21         MR. HUDSPETH:  No, Your Honor.

22         THE COURT:  Okay.  I'm going to go ahead and admit

23  the exhibits that have been adopted by -- submitted by both

24  parties.

25         (Exhibits 1 through 62 admitted into evidence.)

1    MR. COLPITTS:  With -- I do have one issue, Your

2 Honor.  Exhibit Number 62, the billing statements, with the

3 Court's permission I can submit an updated billing statement

4 through yesterday.  I don't know how the Court wants to handle

5 the award of attorney's fees if you do find in our favor.

6 Would you rather we file --

7    THE COURT:  Well, wait till we get to 62.  Sometime

8 during the process of your -- your part of the case you can go

9 ahead and --

10    MR. COLPITTS:  I'll do that.

11    THE COURT:  -- offer them, okay?

12    MR. COLPITTS:  I will.

13    THE COURT:  Okay.  Mr. Hudspeth, do you have

14 anything?

15    MR. HUDSPETH:  Your Honor, I just reserve the right

16 to -- with regard specifically to the attorney's fees to raise

17 issues as to the reasonableness, hourly rate, things like that.

18    THE COURT:  Well, if I determine that Mr. Colpitts is

19 the prevailing party then we can do that at that time, okay?

20    MR. HUDSPETH:  Yes, sir.

21    THE COURT:  Okay.  Mr. Colpitts, you're the lead dog

22 on the wagon, so you may proceed.

23    MR. COLPITTS:  Your Honor, with the Court's

24 permission I'd call Charles Ridley.

25    THE COURT:  Mr. Colpitts, I want you and Mr. Hudspeth

 1  to keep in mind that the Court -- this Court has a lot of

 2  experience with these cases and I'd be grateful for any effort

 3  that both of you all can make to streamline whatever evidence

 4  you have, okay?

 5              MR. COLPITTS:  I will do my best effort.

 6              THE COURT:  Okay.  Raise your right hand, sir.

 7                    CHARLES DALE RIDLEY, SWORN

 8                      DIRECT EXAMINATION

 9  BY MR. COLPITTS:

10  Q.  Would you state your name for the record, please?

11  A.  Charles Dale Ridley.

12  Q.  Mr. Ridley, are you currently employed?

13  A.  Yes, sir.

14  Q.  And where do you work?

15  A.  I work at St. John's Hospital for Superior Linen Service.

16  Q.  And what is your position there?

17  A.  I'm inventory controller.

18  Q.  And how are you paid?  Is it a salary?

19  A.  Salary.

20  Q.  And how is -- what is your compensation?

21  A.  $805 a week.

22  Q.  And are you losing time off from work for today?

23  A.  Yes, sir.

24  Q.  And what is that going to cost you?

25  A.  Roughly $155.

1   Q.    And where do you live, Mr. Ridley?

2   A.    Haskell, Oklahoma.

3   Q.    Is your residence subject to a mortgage by M&T Bank?

4   A.    Yes, it is.

5   Q.    And in 2011 did you meet with me about the possibility of

6   filing a bankruptcy?

7   A.    Yes, sir.

8   Q.    What caused you to file bankruptcy?

9   A.    I wanted to maintain my home.  I was behind on my home

10  payments and I had surgery and was going to be guaranteed from

11  the hospital.

12  Q.    For medical bills?

13  A.    For medical bills.

14  Q.    And did you then file a Chapter 13 bankruptcy on

15  November 22, 2011?

16  A.    Yes.

17  Q.    And did you complete all of the required payments under

18  the Chapter 13 plan?

19  A.    Yes, sir.

20  Q.    With regard to your mortgage, what was your understanding

21  of your status on the mortgage once you completed the

22  bankruptcy?

23  A.    I would be up to date on my payments and I would owe a

24  balance.

25  Q.    And was it your understanding that you would be current on

1  the mortgage as though no default occurred?

2  A.   Yes.

3        THE COURT:  So you understood it's still a balance?

4        THE WITNESS:  Yes.

5        THE COURT:  How much was the balance?

6        THE WITNESS:  That I'm not sure of, sir.  I don't

7  remember that.

8        THE COURT:  Okay.

9        MR. COLPITTS:  The exhibits for the witness is --

10        THE CLERK:  [Inaudible]

11        MR. COLPITTS:  Yeah.

12  BY MR. COLPITTS:

13  Q.   Mr. Ridley, I've handed you plaintiff's exhibits.  Can you

14  turn to Exhibit Number 5?  Do you have Exhibit Number 5 in

15  front of you?

16  A.   Yes, sir.

17  Q.   Can you tell us what that is?

18  A.   That is my final paperwork from the Bankruptcy Court.

19  Q.   And is that titled "Notice of Final Cure Payment"?

20  A.   Yes, it is.

21  Q.   And does this Notice of Final Cure tell you when to begin

22  making your payments directly to M&T Bank following the Chapter

23  13 bankruptcy?

24  A.   November of 2015.

25  Q.   And do you recall when you mailed your first payment

1  following the bankruptcy --

2  A.    October 24th.

3  Q.    October 24?

4  A.    Yes, sir.

5  Q.    Would you then turn to Exhibit Number 21?

6  A.    Okay.

7  Q.    Can you identify that document for the Court?

8  A.    That's a copy of my check that was returned back to the

9  bank after payment.

10  Q.    And it was mailed to M&T Bank?

11  A.    M&T Bank.

12  Q.    And the date on that check?

13  A.    10/24/15.

14  Q.    Is that the date that you mailed that check?

15  A.    Yes, sir.

16  Q.    And it cleared your bank and paid M&T Bank $700?

17  A.    Yes, it did.

18  Q.    If you'll turn to Exhibit Number 22.  Can you identify

19  that document for us?

20  A.    That is a check to M&T Bank November the 24th of 2015.

21  Q.    And what month is that for?

22  A.    December.

23  Q.    So that's for your December mortgage payment?

24  A.    Yes, sir.

25  Q.    December 2015, correct?

1   A.   Yes, sir.

2   Q.   And will you turn to the next Exhibit 23?  Can you

3   identify that document for us?

4   A.   That's a copy of my check when it cleared the bank for the

5   January payment.

6   Q.   And its date?

7   A.   12/23 of '15.

8   Q.   Now, I notice that you've been mailing these ahead of time

9   early.  Is that correct?

10  A.   Correct.

11  Q.   How do you -- do you have some means of scheduling those

12  or knowing when to send them in?

13  A.   Yes.  I have it marked on my calendar the first full week

14  before it's due.

15  Q.   Okay.  And you do that every month?

16  A.   Yes, sir.

17  Q.   Every year?

18  A.   Every year.

19  Q.   And will you turn to Exhibit Number 24?  Can you identify

20  that document for us?

21  A.   Yes.

22  Q.   What is that?

23  A.   That is a copy of my check for the February payment.

24  Q.   And when did you mail that payment?

25  A.   1/25 of '15.

1   Q.   So you would place these checks in the mail the date that

2   you dated them?

3   A.   Yes, sir.

4   Q.   Would you put them in the mail at your house or would

5   you -- what would you do?

6   A.   I took it -- at the Post Office.

7   Q.   So, in fact, if we were to go through Exhibits 21 through

8   35 they would all reflect the same thing, correct, that you

9   made every monthly payment --

10  A.   Yes, sir.

11  Q.   -- approximately one week in advance?

12  A.   Right.

13  Q.   Since completing your Chapter 13 bankruptcy have you

14  mailed in to M&T Bank every monthly mortgage payment?

15  A.   Yes, sir.

16  Q.   Now, if I could get you to turn to Exhibit Number 41.  Can

17  you identify that document for us?

18  A.   I'm sorry?

19  Q.   Can you identify Exhibit Number 41 for us?

20  A.   Yes, sir.  That's the statement I received from M&T.

21  Q.   And you see about a third of the -- or fourth of the way

22  down on the right it says a statement date.  Can you read that

23  date for us?  It's in small print.

24  A.   That's the date 2/1/16.

25  Q.   Now, that's several months after you completed the

1   bankruptcy.  Is this the first mortgage statement that you

2   received?

3   A.   Yes, it is.

4   Q.   What prompted M&T Bank to finally start sending you

5   mortgage payments?  Do you have any idea?

6   A.   I called them to ask for a complete detail of the

7   statement.

8           MR. HUDSPETH:  Your Honor, I would ask that

9   [indiscernible] communications with M&T Bank [indiscernible]

10  motion to compel and I was assured that no communications would

11  be disclosed.  With [indiscernible] motion to compel

12  [indiscernible] have those records that does not relieve them

13  of the obligation to answer the interrogatory [indiscernible]

14  written communication and none was provided.

15          THE COURT:  I'm going to overrule your objection.

16  BY MR. COLPITTS:

17  Q.   Can you answer the question?

18          THE COURT:  Is that an agreement that you all have?

19          MR. COLPITTS:  No.

20          THE WITNESS:  I called him to ask for a detailed

21  statement of my account since they took over the bankruptcy.

22          MR. COLPITTS:  Okay.

23  BY MR. COLPITTS:

24  Q.   And so then in response to your phone call they began

25  sending you statements?

1  A.    Yes.

2  Q.    And this is -- this Exhibit Number 41 is the first

3  statement that you received?

4  A.    Yes.

5  Q.    And is there anything that stands out to you or stood out

6  to you at the time when you first opened this --

7  A.    Yes.  It showed a balance due of $2261.

8  Q.    So how much is your monthly mortgage payment?

9  A.    $692.

10  Q.    So $2261.69 is not your mortgage payment, is it?

11  A.    No, sir.

12  Q.    Okay.  And as of February 1st were you current on your

13  mortgage payments following the completion of your bankruptcy?

14  A.    Yes, I was.

15  Q.    If you look down -- halfway down the page under "Important

16  Messages," what does it say?  Can you read that for the Court?

17  A.    "There are currently $877.69 in fees outstanding on your

18  M&T mortgage account."

19          THE COURT:  Is that for escrow or what is that for?

20          MR. COLPITTS:  That's what we don't know.  I believe

21  it is fees that were left over from the Chapter 13 bankruptcy.

22  BY MR. COLPITTS:

23  Q.    And if you go on down, Mr. Ridley, to "Transaction

24  Activity," can you read that for us?

25  A.    Transaction date was 1/29 of '16, to date 1 of '16,

1  partial payment $700.

2  Q.    So if you go back to Exhibit Number 24, which is your

3  January 25 check --

4  A.    Right.

5  Q.    -- and it's for $700.

6  A.    Yes, sir.

7  Q.    So would -- does it appear to you that they have applied

8  your January 25th check to the January monthly payment --

9  A.    Yes.

10  Q.    -- as opposed to applying it to what it should be, which

11  is the February payment?

12  A.    Yes.

13  Q.    So what does this statement tell you?

14  A.    That they misplaced one of my payments.

15  Q.    Will you turn now to Exhibit Number 42?  Can you tell us

16  what this document is?

17  A.    That shows a copy of my statement, payment due 3/1 on this

18  statement.

19  Q.    And what's the amount that this statement showing is due?

20  A.    $1559.69.

21  Q.    And again, your payment is $692 a month, correct?

22  A.    Yes, sir.

23  Q.    And read the important message again.

24  A.    "Please note there is $877.69 in fees outstanding in your

25  M&T account."

1          THE COURT:  Fees?

2          MR. COLPITTS:  Yes, sir.

3          THE COURT:  Okay.

4   BY MR. COLPITTS:

5   Q.    And read the transaction activity.

6   A.    2/29 of '16, date due is 2/16, payment $700.

7   Q.    So again, is that showing you're a month behind?

8   A.    Yes, sir.

9   Q.    Will you now turn to Exhibit Number 43?  Can you identify

10  this document for the Court?

11  A.    That's my April statement.

12  Q.    And how much does it say is due?

13  A.    $1569.69.

14  Q.    And will you read the important message again?

15  A.    "There is $877.69 in fees outstanding on your M&T

16  account."

17  Q.    And will you read the transactional activity?

18  A.    3/28 of '16, 3 of '16, partial received paid $692.  Right

19  below it 3/28 of '16, this 3/16 is the due date, and it showed

20  where they had principal and interest in escrow.

21  Q.    So of interest to me is it says "partial payment

22  received."

23  A.    Right.

24  Q.    How much is your monthly payment?

25  A.    $692.

Case 16-08008    Doc 44-2    Filed 03/03/17    Entered 03/03/17 16:05:19    Desc Exhibit
Exhibit B    Page 14 of 66

1  Q.   How much are they showing received?

2  A.   $877.69.

3  Q.   Now, how much are they showing that they received on that

4  first one?

5  A.   They received the $692.

6  Q.   So they received your monthly payment?

7  A.   Right.

8  Q.   But yet, they're showing that's a partial payment?

9  A.   Right.

10  Q.   Will you turn now to Exhibit Number 44?  Can you identify

11  that document for us?

12  A.   That is my April statement.

13  Q.   And how much are they showing is due?

14  A.   $2261.69.

15  Q.   And again, your monthly payment is how much?

16  A.   $692.

17  Q.   Okay.  This time I want you to look under explanation of

18  amount due on the right side.

19  A.   Okay.

20  Q.   Right above the total amount due for May 1, '16, what does

21  it say?  What's the line?

22  A.   Recoverable forfeit advances --

23  Q.   And --

24  A.   -- $152.59.

25  Q.   And they show the total amount due May 1, 2016, of how

1  much?

2  A.    May.

3  Q.    No, on that same sheet right below what I just had you

4  read?

5  A.    $2261.69.

6  Q.    Now, if you will turn to Exhibit Number 45 can you

7  identify this document for the Court, please?

8  A.    My May statement.

9  Q.    And what's the amount they're showing due?

10  A.    $1569.69.

11  Q.    And again, down in transactional activity, what does that

12  state?

13  A.    4/28 of '16, the transaction date, due date 4/16, payment

14  $692.

15  Q.    So they continue to show you delinquent?

16  A.    Right.

17  Q.    One month.

18  A.    Um-hum.

19  Q.    So they are apply -- M&T is applying your payments at

20  least one month behind?

21  A.    Yes, sir.

22  Q.    Now if you look at Exhibit Number 46, can you identify

23  that for us?

24  A.    That is my June 1 payment -- statement.

25  Q.    And what's the amount due?

 1  A.    2261.59.

 2  Q.    And, in fact, if we were to go through the rest of these

 3  statements they're going to say the same thing.

 4  A.    Yes, sir.

 5  Q.    That you were one month behind --

 6  A.    Uh-huh.

 7  Q.    -- and there is recoverable corporate advances of varying

 8  amounts --

 9  A.    Right.

10  Q.    -- that you do not owe?

11  A.    Right.

12  Q.    Now, if you will turn to Exhibit Number 54, can you

13  identify this document for the Court?

14  A.    That is my 9/1/16 statement.

15  Q.    What's the amount due now?

16  A.    3168.06.

17  Q.    So as of September of 2016 were you current on your

18  mortgage payments?

19  A.    Yes, sir.

20  Q.    And again, we've already said you mailed in every one at

21  least a week early?

22  A.    That's right.

23  Q.    But yet, the amount due keeps getting larger?

24  A.    Yes.

25  Q.    So --

 1          THE COURT:  During these months did you talk to

 2  anybody from the bank?

 3          THE WITNESS:  Yes, sir.  For a while I was getting

 4  calls every other week.

 5          THE COURT:  From the bank?

 6          THE WITNESS:  Right.

 7          THE COURT:  These were calls you did not initiate?

 8          THE WITNESS:  Right.

 9          THE COURT:  Okay.  Mr. Colpitts.

10  BY MR. COLPITTS:

11  Q.   What would they tell you in those phone calls?

12  A.   They would tell me I was a month behind.

13  Q.   So back to Exhibit Number 54.  If you will look down at

14  the transactional activity can you read that for us?

15  A.   9/15 of '16 I have a late charge of 31.38.

16  Q.   Were you ever late?

17  A.   No.

18  Q.   So why did they charge you a late fee?

19  A.   I'm assuming because they thought I was a month behind.

20          MR. HUDSPETH:  Your Honor, object to the response

21  [indiscernible].

22          MR. COLPITTS:  Well, Your Honor, they've left him --

23          THE COURT:  I'll overrule the objection.

24          MR. COLPITTS:  Okay.

25  BY MR. COLPITTS:

1  Q.   Will you read the next lines?

2  A.   9/15 of '16, foreclosure attorney fees 252.50.  It has

3  another line, the same thing for $350, another line the same

4  date the foreseeable -- foreclosure attorney's fees for

5  $262.50.

6  Q.   So now M&T Bank is charging you foreclosure attorney's

7  fees?

8  A.   Yes, sir.

9          THE COURT:  Now, do you know of your own knowledge

10 whether or not a foreclosure was filed?  Were you served a

11 summons?

12         THE WITNESS:  No, sir.

13         THE COURT:  Have you ever been served a summons?

14         THE WITNESS:  No, sir.

15 BY MR. COLPITTS:

16 Q.   So in September of 2016 you're current on your mortgage

17 payments but yet you're being charged for foreclosure

18 attorney's fees?

19 A.   Yes.

20 Q.   Can you read the important message on that statement?

21 A.   "Our records show that you have -- we have not received

22 the required mortgage payment on the account listed.  Please

23 note that there is currently $1784.07 in fees outstanding on

24 your M&T account."

25 Q.   Thank you.  Would you please turn to Exhibit Number 55?

1  Can you identify this document report?

2  A.   That's the mortgage statement for 10/1 of '16.

3  Q.   And what's the amount stated as due now?

4  A.   3168.07.

5  Q.   If you'd turn to Exhibit Number 19.

6         THE COURT:  Mr. Ridley, on that Exhibit 56 the paid

7  year to date at 6252, do you believe that entry to be --

8         THE WITNESS:  56, sir, you said?

9         THE COURT:  6252 is the year-to-date payment.  Do

10 you -- you reviewed your records see that as correct or not?

11        THE WITNESS:  No, I have not reviewed them, sir.

12        THE COURT:  Okay.

13 BY MR. COLPITTS:

14 Q.   If you'll look at Exhibit Number 19.

15 A.   19-1?

16 Q.   Yes.

17 A.   Okay.

18 Q.   Can you identify that document for us?

19 A.   Yes.  It says I'm in default of my mortgage loan.

20 Q.   Okay.  So it's a letter from M&T Bank dated October 3,

21 2016?

22 A.   Yes.

23 Q.   And the first sentence of the letter says -- can you read

24 that for us?

25 A.   "You are in default of your -- of the term of your

1  mortgage loan."

2  Q.   So you received that in October, I'm going to assume?

3  A.   Yes, sir.

4  Q.   Do you recall receiving that letter?

5  A.   Yes, I do.

6  Q.   How did that make you feel when you received that letter?

7  A.   I thought something -- they had posted it wrong somewhere.

8  Q.   You thought they lost payment?

9  A.   Right.

10 Q.   How did all these mortgage statements that you received

11 make you feel?

12 A.   I thought they was adding charges that shouldn't be added.

13 Q.   And what about the foreclosure attorney's fees?

14 A.   I couldn't understand why they want to foreclose.  I was,

15 in my mind, up to date on my payments.

16 Q.   Well, in your mind and in fact, right?

17 A.   Right.

18 Q.   Okay.  Now if you'll turn to Exhibit Number 56 can you

19 identify that document for us?

20 A.   That is my 10/1 of '16 statement.

21 Q.   And what's the amount stated as due on that statement?

22 A.   4,021.95.

23 Q.   And read the important message.

24 A.   "Our records show that we have not received the required

25 mortgage payment owed this account."

1 Q.   And continue the first sentence of the next --

2 A.   "Please note there is currently $2,637.95 in fees

3 outstanding on your mortgage account."

4 Q.   And then under "Transactional Activity" will you read

5 those lines for us again?

6 A.   10/13 of '16, foreclosure attorney fees $35, 10/13 of '16

7 foreclosure attorney fees 252.50, 2/13 of '16, foreclosure

8 attorney fees of 350, 10/13 of '16 foreclosure fees 1775, 10/17

9 of '16 date due 10/15 late charge 3138.

10 Q.   So in October of this last year, less than five months

11 ago --

12 A.   Right.

13 Q.   -- M&T Bank is charging you foreclosure fees --

14 A.   Right.

15 Q.   -- and late fees?

16 A.   Right.

17 Q.   Do you remember when you hired me?

18 A.   I hired you for -- in --

19 Q.   For this adversary.

20 A.   -- January.

21 Q.   Yeah.  And we filed this lawsuit in May of 2016, right?

22 A.   Right.

23       THE COURT:  Mr. Colpitts, preceding the lawsuit did

24 you ever put a letter or some kind of a demand?

25       MR. COLPITTS:  I did not.

 1  BY MR. COLPITTS:

 2  Q.   So since May of 2016 M&T Bank has had notice of this

 3  problem?

 4  A.   Right.

 5  Q.   But yet they've now in October charging you foreclosure

 6  fees and late fees that you do not owe?

 7  A.   Right.

 8  Q.   And on -- back on Exhibit Number 56 -- Exhibit Number 56,

 9  that statement --

10  A.   Uh-huh.

11  Q.   -- what's the amount shown as due?

12  A.   $4,021.95.

13          THE COURT:  This is by the bank?

14          MR. COLPITTS:  Yes.  Yes, it's what they're saying is

15  due for the month of October 2016.

16  BY MR. COLPITTS:

17  Q.   If you'll turn to Exhibit Number 57.

18  A.   Okay.

19  Q.   Can you identify that document?

20  A.   That's my November statement.

21  Q.   And what's the amount due now?

22  A.   3304.95.

23  Q.   And under "Transaction Activity" can you tell us what that

24  says?

25  A.   10/26 of '16, an insurance inspection $25, 2/29 payment

1  $692.

2  Q.   Why on earth would they be doing an insurance inspection

3  on your home?

4  A.   I have no idea.

5          THE COURT:  It looks to me like the amount owed is

6  somewhat less than the month before.

7          MR. COLPITTS:  They -- if --

8          THE COURT:  It looks like $4,000 down to --

9          MR. COLPITTS:  It's going like this.  It's going up

10 and down.

11         THE COURT:  So do we know why the statement -- amount

12 on the statement went down?

13         THE WITNESS:  No, sir.

14         MR. COLPITTS:  And in the next month they'll go up,

15 as I'll show you, Your Honor.

16 BY MR. COLPITTS:

17 Q.   Will you look at Exhibit Number 58?

18 A.   Okay.

19 Q.   And --

20 A.   November statement.

21 Q.   And the amount due?

22 A.   4815.83.

23 Q.   And again look at the transactional activity.  Can you

24 read those for the Court?

25 A.   I've got foreclosure attorney fees of 175, 262.50, 87.50

1  and 262.50.  Quarter [ph.] late fee is 31.38.

2  Q.    And so again despite being current on your mortgage

3  payments your amount due every month keeps going gradually

4  higher and higher.

5  A.    Um-hum.

6  Q.    And now you're at $4800?

7  A.    Right.

8  Q.    Would you read the important message?  There's a -- the

9  second paragraph of the important message.

10  A.    "Our records show that you have not -- we have not

11  received the required mortgage payment on your account listed."

12  Q.    And the first line of the next paragraph.

13  A.    "Please note there is currently $3,431.83 in fees

14  outstanding in your mortgage account."

15  Q.    And then if you will read over on the right explanation of

16  amount due, there's a -- what's the amount next to recoverable

17  corporate advance?

18  A.    $3,337.69.

19  Q.    And the --

20          THE COURT:  Did you say corporate advance?

21          MR. COLPITTS:  Yes.  That's what they're labeling

22  these as "corporate advance."  They appear to me to be adding

23  all of these bogus foreclosure attorney's fees to the original

24  $877 that apparently came out of the foreclosure.

25          THE COURT:  Did you get any extra money from them?

1          THE WITNESS:  No, sir.

2          THE COURT:  Did they send you any checks?

3          THE WITNESS:  No, sir.

4   BY MR. COLPITTS:

5   Q.   So, Mr. Ridley, how -- what's your conclusion after

6   receiving these mortgage statements?

7   A.   I felt like they mis-posted my money somewhere.

8   Q.   Did you have any concerns?

9   A.   Yes, sir.

10  Q.   Were you concerned that they were going to --

11  A.   I was afraid they was going to take my house.

12  Q.   You were afraid they're going to try and take your house

13  from you, weren't you?

14  A.   Yes, sir.

15  Q.   So you want M&T Bank to fix this -- your mortgage

16  statements?

17  A.   Yes, I do.

18  Q.   And that's what you're asking this court to order them to

19  do today?

20  A.   Yes, sir.

21          MR. COLPITTS:  Okay.  I do not have any further

22  questions for Mr. Ridley.

23          THE COURT:  Thank you.

24          Matt.

25          MR. HUDSPETH:  Thank you, Your Honor.

1                            CROSS-EXAMINATION

2    BY MR. HUDSPETH:

3    Q.   Good morning, Mr. Ridley.  My name is Matt Hudspeth and I

4    represent M&T Bank.  It's my turn to ask you some questions

5    now.

6    A.   Okay.

7    Q.   Would you look at Exhibit Number 35, please?

8    A.   Okay.

9    Q.   Is that for your January 2017 payment?

10   A.   Yes, it is.

11   Q.   Did you receive a notice that that check had been

12   dishonored?

13   A.   Yes, I did.

14   Q.   Okay.  So when you said that you made all your payments

15   and they went through, that's not exactly accurate, is it?

16   A.   Well, on that statement they said that it -- they would

17   run a second time.  They charge you $10 for the fee for -- and

18   it went through the second time.

19   Q.   Okay.  But the check was not honored the first time, is

20   that correct?

21   A.   No, it was not.

22   Q.   Okay.  So your testimony originally was inaccurate, is

23   that correct?

24   A.   They did run through the second time it went.

25   Q.   In all those statements that you just went through and

1    read to the Court do you ever see where any of your payment was

2    taken and applied to these fees?

3    A.    No.

4    Q.    So they didn't take money from you to cover those fees,

5    did they?

6    A.    No, they didn't take --

7    Q.    Okay.

8    A.    Because I didn't pay any.

9    Q.    And for a good amount of these statements you were

10   represented by counsel at the time these statements came in,

11   were you not?

12   A.    Yes, I was.

13   Q.    And this adversary proceeding was actually pending, is

14   that correct?

15   A.    I'm sorry?

16   Q.    And this adversary proceeding that we're here on today was

17   actually pending?

18   A.    Yes.

19   Q.    Okay.  I'm going from memory on this and I can -- well,

20   actually may I move from the podium, Your Honor?

21            THE COURT:  Yes.

22   BY MR. HUDSPETH:

23   Q.    You said that you have never been served with summons or

24   foreclosure.  Do you recall saying that?

25   A.    Yes, I do.

1  Q.   You've never been served a summons or faced fore -- or

2  been involved in foreclosure?

3  A.   No.

4  Q.   Okay.  Do you know why then your attorney filed in this

5  matter his pretrial memorandum on December 8 of 2016 when he

6  says, "The plaintiff Charles D. Ridley filed a Chapter 13

7  bankruptcy to resolve his debt issues and to save his home from

8  foreclosure."

9  A.   Right.  I've never been in foreclosure.

10 Q.   Had you been threatened with foreclosure?

11 A.   No, I have not.  At that time I was with Chase Bank and I

12 was behind on my payments.

13 Q.   Okay.  None of the exhibits there that your attorney has

14 produced and introduced to the Court contain any threats of

15 foreclosure, do they?

16 A.   The only thing it does is the attorney put foreclosure

17 attorney fees.

18 Q.   Again, move to strike.  Non-responsive.  None of those

19 state that -- they threaten foreclosure, do they?

20 A.   No, they don't.

21 Q.   Do any of them actually demand money from you?

22 A.   Per the statement they do.

23 Q.   Well, if you look at it, it says "Amount Billed," and that

24 is your mortgage payment and then it lists the other fees,

25 correct?

1  A.   Right.

2  Q.   Okay.  Now, you talked about calls you made to M&T Bank.

3  In any of those calls did you complain about any of these fees?

4  A.   Yes, I did.

5  Q.   You did?  So if M&T Bank has -- testifies to the contrary

6  are they not being truthful?

7  A.   Yes, they are.

8  Q.   Okay.  Did you get angry and irate and hang up on any of

9  the M&T employees?

10  A.   Yes, I did.

11          MR. HUDSPETH:  Okay.  May I have a moment, Your

12  Honor?

13          THE COURT:  Sure.

14              [Pause in the proceedings.]

15          MR. HUDSPETH:  Nothing further, Your Honor.

16          THE COURT:  Okay.  Thank you.

17          Mr. Colpitts?

18          MR. COLPITTS:  No further questions of Mr. Ridley.

19          THE COURT:  You're finished.

20          THE WITNESS:  Thank you, sir.

21          (Witness excused.)

22          THE COURT:  Do you have any other witnesses?

23          MR. COLPITTS:  Your Honor, I'd like to call a

24  representative from M&T Bank.

25          THE COURT:  Which one?

1          MR. COLPITTS:  There's three of them there, I would

2     assume, so they can choose.

3          MR. HUDSPETH:  [Indiscernible] M&T representative.

4               JEREMY KIRSH, SWORN

5          THE COURT:  Who's running the bank today?  Like you

6     all brought everybody out to court.

7          MR. COLPITTS:  I guess they found out it was me.

8          THE COURT:  I doubt that.

9                    DIRECT EXAMINATION

10    BY MR. COLPITTS:

11    Q.   Can you state your name for the record, please?

12    A.   Jeremy Kirsh.

13    Q.   Say again?

14    A.   Jeremy Kirsh.

15    Q.   Jeremy Kirsh.

16    A.   Yes.

17    Q.   And where are you from, Mr. Kirsh?

18    A.   I am -- I reside in Williamsville, New York, which is

19    outside of Buffalo.

20    Q.   Well, welcome.

21    A.   Thank you.

22    Q.   What is your capacity with M&T Bank?

23    A.   I'm a mortgage outreach manager.

24    Q.   And what does mortgage outreach manager mean?

25    A.   We're a cost center.  We do collection efforts.

1  Q.   Are you familiar with Mr. Ridley's M&T Bank loan file?

2  A.   Somewhat, yes.

3  Q.   Somewhat.  Okay.  Define "somewhat."

4  A.   I was asked to review it the day before yesterday and that

5  was the first time that I had seen the account, so I was able

6  to review some of the notes and some of the information on it.

7  Q.   So you've not been actively involved in Mr. Ridley's loan

8  file?

9  A.   No, I have not.  Not personally.

10  Q.   Are you involved with mortgage loan files after they come

11  out of Chapter 13 bankruptcy?

12  A.   If they move into collections.  If they move -- I'm

13  sorry -- if they move past due.

14  Q.   I'm sorry.  Say again.

15  A.   If they end up being delinquent.

16  Q.   What -- are you familiar with any procedures that M&T Bank

17  has with regard to mortgage loans that move out of a Chapter 13

18  bankruptcy?

19  A.   The procedures that would occur once they move into my

20  department, yes.

21  Q.   So you have no knowledge of procedures at M&T Bank with

22  regard to loans moving out of Chapter 13 bankruptcy unless they

23  are in default?

24  A.   Correct.

25  Q.   Okay.  Was Mr. Ridley's loan file in your department?

1  A.    Yes.

2  Q.    And why was it in your department?

3  A.    Because the account was showing delinquent.

4  Q.    And why was it showing delinquent?

5  A.    My -- from what I reviewed on the account it appeared that

6  the account was running one month past due.

7  Q.    The exhibits, are they up there?

8          MR. COLPITTS:  May I approach the witness, Your

9  Honor?

10         THE COURT:  Sure.

11  BY MR. COLPITTS:

12  Q.    Could you please look at -- will you please refer to

13  Exhibit Number 41?  This is a document that we've previously

14  identified as M&T mortgage statement dated February 1, 2016,

15  and it is the mortgage statement that Mr. Ridley says is the

16  first one he received following the bankruptcy, the completion

17  of the bankruptcy.  If you will look at the right side,

18  explanation of amount due, it says "Recoverable Corporate

19  Advance."  I believe it's $862.69.  Can you tell us why that's

20  shown on his statement?

21  A.    They are fees that he was showing being due -- or being

22  charged.

23  Q.    Do you know where those fees came from?

24  A.    That I do not know.  Oh, I'm sorry, no, I do not.  Yeah.

25         THE COURT:  Could you move that speaker a little

1 closer to you?  Try that.

2          THE WITNESS:  Sorry about that.

3 BY MR. COLPITTS:

4 Q.   Do you have any knowledge as to why Mr. Ridley's mortgage

5 loan account immediately following the completion of his

6 bankruptcy showed fees and charges due?

7 A.   No, I do not.

8          MR. COLPITTS:  Your Honor, I suggest that Mr. Kirsh

9 does not have any knowledge with regard to Mr. Ridley's

10 account, so I don't have any further questions from him.  Maybe

11 Mr. Hudspeth would like to cross-examine him, but I would like

12 to know whether either of these remaining representatives have

13 any actual knowledge.

14          THE COURT:  I guess we'll just see.

15          Mr. Hudspeth, do you have any questions for your

16 witness?

17          MR. HUDSPETH:  Your Honor, I do and I don't know if

18 the Court would like to let me proceed out of time and use him

19 for part of the direct.  I [indiscernible] or call him back,

20 whatever the Court prefers.

21          THE COURT:  I don't care.  Cross-examine him now.

22                        CROSS-EXAMINATION

23 BY MR. HUDSPETH:

24 Q.   Mr. Kirsh, with regard to I believe it was Exhibit 41,

25 that statement is for February of 2016, correct?

1  A.    Correct.

2  Q.    If the evidence showed that Mr. Ridley came out of

3  bankruptcy in October of '15, then there's some three months in

4  between the two instances, is that correct?

5  A.    Correct.

6  Q.    Okay.  In your capacity of your employment with M&T Bank

7  do you have access to the records kept with regard to loans

8  handled by M&T?

9  A.    Yes, I do.

10  Q.    And are those records kept in the regular and normal

11  course of business?

12  A.    Yes, sir.

13  Q.    And in those records are there notes made of events

14  happening on each loan?

15  A.    Yes, sir.

16  Q.    And are those contemporaneously made with the events as

17  they occur?

18  A.    Yes, sir.

19  Q.    Okay.  You heard Mr. Ridley's testimony that he complained

20  about these fees to M&T Bank.  In your review of those records

21  does that bear out?

22  A.    No, it does not, sir.

23  Q.    Do those records reflect any complaints about these fees?

24  A.    No.

25  Q.    What do those records reflect?

1  A.   They show that he was questioning being past due and most

2  conversations ended with him hanging up on our representatives.

3  Q.   Okay.  And in those conversations do they reflect M&T Bank

4  taking any actions to investigate his claims?

5  A.   They requested proof of payments to be sent in, which were

6  never provided.

7  Q.   Did M&T Bank conduct an investigation on their own side of

8  it as well?

9  A.   Yes, they did.

10 Q.   Okay.  And to your knowledge, that investigation

11 corroborated M&T's showing him one month behind?

12 A.   Correct.

13 Q.   And again, Mr. Ridley never proved otherwise?

14 A.   Correct.

15         THE COURT:  Well, is Mr. Ridley required to prove why

16 he's behind?  Is it that --

17         THE WITNESS:  We were just asking for copies of

18 payments that he said he had made.

19         THE COURT:  Is it that the [indiscernible] of your

20 bank that --

21         THE WITNESS:  We made accurate statement --

22         THE COURT:  -- when you said, "Do you have an

23 explanation for it?"

24         THE WITNESS:  We did try to find any issues, you

25 know, that we could resolve, but unfortunately we were unable

1  to find anything, so our representatives did request that, you

2  know, copies of the payments be sent to us to try and help us

3  with the investigation.

4          THE COURT:  Okay.

5  BYU MR. HUDSPETH:

6  Q.   And do those records reflect any contact from plaintiff's

7  counsel prior to the adversary being filed?

8  A.   No.

9  Q.   No calls, no letters, nothing?

10 A.   Not to my knowledge.

11 Q.   With regard to the fees that are listed on those billing

12 statements what does M&T do about those fees if they aren't

13 paid?

14 A.   They are not required to be paid until the -- technically

15 till the end of the mortgage [inaudible].

16 Q.   Okay.  And in your review of Mr. Ridley's account have you

17 been able to determine if those fees are being assessed against

18 his account any longer?

19 A.   From my knowledge, no.

20 Q.   They are not being assessed any longer?

21 A.   Correct.

22 Q.   To your knowledge has he now been deemed current on his

23 account?

24 A.   To my knowledge, yes.

25          THE COURT:  Okay.  And what date was that?

 1              THE WITNESS:  That was recent.  Unfortunately, I

 2  don't know the exact dates, Your Honor.

 3  BY MR. HUDSPETH:

 4  Q.   Mr. Kirsh, just to confirm, Mr. Ridley's calls to M&T were

 5  not addressing the fees.

 6  A.   Correct.

 7  Q.   He was complaining about M&T showing him one month behind?

 8  A.   Correct.

 9              MR. HUDSPETH:  That's all I have, Your Honor.

10              THE COURT:  Thank you.

11              You may be excused.

12              MR. COLPITTS:  Your Honor, may I --

13              THE COURT:  Oh.  I'm sorry, go ahead.

14              MR. COLPITTS:  I'm sorry.  I did indicate that I was

15  done.

16                      REDIRECT EXAMINATION

17  BY MR. COLPITTS:

18  Q.   But, Mr. Kirsh, you testified to me that you didn't know

19  where the $877 on the February statement and corporate advances

20  came from.

21  A.   Correct.

22  Q.   That's correct.  Okay.  So if you took -- if your

23  department took over the loan immediately following the

24  Chapter 13 bankruptcy wouldn't that be in your records?  I

25  mean, if --

1   A.   This wouldn't be handled within my department.  Those fees

2   were prior.

3   Q.   Prior to coming out -- prior to coming to your department?

4   A.   From my understanding, yes, yes.

5   Q.   When did this loan come to your department?

6   A.   Sometime in early 2016 or late 2015.

7   Q.   Okay.  So late 2015 would be immediately right after he

8   completed the Chapter 13 bankruptcy.  Is that correct?  I mean,

9   he -- his first payment to M&T Bank was November 2015.  Late

10  2015 is December, November, so that's right there, right?

11  A.   Right.  I show that we were making, you know, efforts to

12  contact him in January of 2017 from my department.

13  Q.   Okay.  Will you look at -- back to that point, so

14  Mr. Hudspeth's allegation that those charges arose following

15  his completion of the Chapter 13 bankruptcy is not correct, is

16  it?

17          MR. HUDSPETH:  Your Honor, Mr. Hudspeth's allegation?

18          MR. COLPITTS:  Yes.  It was your -- you stood here

19  and said that those charges could have come in in October,

20  November, December or January.

21          MR. HUDSPETH:  The record will reflect if I said it,

22  I don't recall saying that, but --

23          THE COURT:  That's okay.  Go on.

24          THE WITNESS:  I'm sorry.  Could you repeat?

25  BY MR. COLPITTS:

1  Q.   So if Mr. Hudspeth made the allegation from this podium

2  that the corporate advances on this February statement came

3  from the months immediately preceding, meaning January,

4  December and November, that would not be possible, right, to

5  your knowledge?

6  A.   I'm sorry.  I can't answer that.  I don't know.

7  Q.   But you don't know where those charges came from on the

8  February statement?

9  A.   Correct.

10 Q.   Will you look at Exhibit Number 54?  Why is Mr. Ridley's

11 mortgage account being charged foreclosure attorney's fees?

12 Shown down at the very bottom of transactional history.

13 A.   (No audible response.)

14 Q.   Do you see what I'm referring to?

15 A.   Yes, I do and I'm trying to review it for me to -- I'm

16 sorry.  I'm trying to review this.

17 Q.   Sure.  Take whatever time you need.

18                    [Pause in the proceedings.]

19 A.   I'm sorry.  Unfortunately, I don't know.  I'd have to go

20 back to check through the records at that time of our system to

21 see how far delinquent the account was.

22 Q.   Would that indicate to you that M&T Bank had hired a

23 foreclosure attorney?

24 A.   That's how it appears, but unfortunately I don't know for

25 sure.

1  Q.   Well, why else would M&T Bank be paying a foreclosure

2  attorney?

3  A.   Again, I don't have an answer to that.

4  Q.   Do you know who would have the answer for that?

5  A.   Again, I'd have to go back and check through our records.

6  I'd be able to -- you know, trying to find that answer.

7  Q.   So if your mortgage loan was being shown delinquent and

8  the representative at the mortgage servicer refused to

9  acknowledge that you were current when you were, would that not

10 make you irate?

11 A.   It would make me contact the bank and speak to them in

12 full detail about the account.

13 Q.   And if that's what Mr. Ridley thought he was doing and he

14 got no response wouldn't that make you irritated?

15 A.   Again, if this was me, I would be in contact with the bank

16 to discuss the full issues going on.  Unfortunately, you know,

17 it seems like most -- every conversation that we had was

18 strictly about the delinquency on the account and that was it.

19 Q.   And why -- let's talk about that.  Then why were the

20 mortgage statements showing him delinquent?

21 A.   As far as I know he was running past due.

22 Q.   Okay.

23 A.   I'm sorry.

24 Q.   You understand -- well, maybe not.  Do you understand that

25 M&T Bank as the defendant in this case has already stipulated

1  that Mr. Ridley was current on his mortgage payments following

2  the completion of the Chapter 13 bankruptcy?

3  A.    Okay.

4  Q.    Okay.  So you were not aware of that?

5  A.    No, I -- unfortunately, I --

6  Q.    You just got this file two days ago?

7  A.    Correct.

8  Q.    Okay.  So since M&T Bank has already stipulated that he

9  was current and is current as of today, since the bankruptcy

10 was completed why were these mortgage statements showing him

11 delinquent one month?

12 A.    Again, we showed in our record system that he was showing

13 a month past due.

14 Q.    So if M&T Bank's mortgage statements were accurate why

15 would they be showing that?

16 A.    That a monthly payment was missed.

17 Q.    By M&T Bank?

18 A.    No, that it was not received.

19 Q.    But M&T Bank has stipulated for purposes of this trial --

20 and, in fact, he was because that's why they stipulated to

21 it -- they stipulated that he was current in his statement --

22 in his payments.

23 A.    I don't understand.

24 Q.    That was -- I'm going back to my basic question is, why

25 are these statements showing him delinquent when, in fact, he

1  was not?

2  A.    We show that he was delinquent.

3  Q.    Okay.  Do you acknowledge that he was not delinquent?

4  A.    At what point in time?

5  Q.    Since November 2015.

6  A.    Again, showing for two -- since January of 2016 I show

7  that he was delinquent.

8  Q.    He was or was not?

9  A.    Was.

10 Q.    Was.  You're show -- as of what date?

11 A.    Again, I don't have the specific dates.  It came into my

12 department, I see conversations initiated as of January of

13 2016.

14 Q.    So January 2016 came into your department and M&T Bank

15 shows Mr. Ridley's account delinquent?

16 A.    Correct.

17 Q.    And you're not willing to acknowledge that that is wrong?

18 A.    Unfortunately, according to our system of record, that is

19 correct.

20 Q.    So regardless of the fact that Mr. Ridley is, in fact,

21 current in January of 2016, even as we sit here today after

22 nine months of litigation and you, the representative for M&T

23 Bank, is refusing to acknowledge that he was current for every

24 month following November 2015?

25 A.    According to our system of record, correct, he was

1  delinquent.

2  Q.   He was -- say that again.

3  A.   He was delinquent.

4         THE COURT:  According to their records.

5         THE WITNESS:  Right.

6  BY MR. COLPITTS:

7  Q.   And when was the last month that M&T Bank's records show

8  him delinquent?  They showed him delinquent in January 2017,

9  didn't they?

10  A.   Correct.

11  Q.   They showed him delinquent in his February statement,

12  didn't they?

13  A.   That I'm not sure of.  Review that February statement.

14  Q.   So as of three weeks ago your records still showed him

15  delinquent, to your knowledge?

16  A.   Correct.  Yes.

17         MR. COLPITTS:  I don't have any further questions.

18         THE COURT:  Thank you.

19         Mr. Hudspeth.

20         MR. HUDSPETH:  Just briefly, Your Honor.  Try to

21  clear it up a little bit.

22                    RECROSS EXAMINATION

23  BY MR. HUDSPETH:

24  Q.   Sir, is -- look at Exhibit 1, please.  Is that a

25  promissory note?

1  A.    Yes, sir.

2  Q.    Look at the bottom.  Do you see any indication as to the

3  type of loan that is?

4  A.    The multi-state fixed rate note?

5  Q.    Yes.  But near that does it say Fannie Mae, Freddie Mac?

6  A.    Correct.

7  Q.    So this is a Fannie or Freddie loan?  Is that correct?

8  A.    Correct.

9  Q.    That means that the beneficiary of the note is Fannie or

10  Freddie?

11  A.    Correct.

12  Q.    M&T Bank is one of the servicers for the loan, correct?

13  A.    Correct.

14  Q.    Is it component servicing on this loan?

15  A.    Yes.

16  Q.    Which component does M&T handle?

17  A.    I'm sorry.  I don't --

18  Q.    Which component of the servicing does M&T handle?

19  A.    We -- the mortgage collections.

20  Q.    Okay.  Is there another entity that handles a different

21  component of this loan?

22  A.    Are you speaking of Bayview, sir?

23  Q.    Yes, sir.  And do you know what components they handle?

24  A.    No, I do not.

25  Q.    Okay.  So if these fees were incurred during a different

1  servicing component, M&T wouldn't have knowledge of that, would
2  they?
3  A.   Correct.
4            MR. HUDSPETH:   Okay.   That's all, Your Honor.   Oh,
5  I'm sorry.
6                  [Pause in the proceedings.]
7  BY MR. HUDSPETH:
8  Q.   Sir, if you know, on those billing statements where it
9  shows the total amount billed and then the total amount due,
10  could the delinquency be attributed to the non-payment of the
11  difference between the normal payment and the total amount due,
12  if you know?
13  A.   I'm sorry.  Can you repeat that?
14  Q.   Okay.
15  A.   I'm sorry.
16  Q.   When you look at the billing statement --
17  A.   Um-hum.
18  Q.   -- you see at the top where it has "Total Amount Billed"
19  and that's the normal mortgage payment amount, correct?
20  A.   Correct.
21  Q.   And then below that it has the additional amounts that
22  have come to issue and then it has a total amount due.  Is it
23  possible the delinquency that M&T shows is attributed to the
24  value to pay the difference between the normal mortgage payment
25  and the total amount due?

1  A.   No, sir.

2         MR. HUDSPETH:  Okay.  That's all I have.

3         THE COURT:  Mister --

4         MR. COLPITTS:  I don't have any further questions of

5  this witness.

6         THE COURT:  Thank you, sir.

7         THE WITNESS:  Thank you.

8         THE COURT:  Mr Hudspeth, call your next witness.

9         MR. COLPITTS:  Well, actually it's mine, Your Honor,

10  but it's --

11         THE COURT:  Okay.

12         MR. COLPITTS:  I would like to inquire of a witness

13  for M&T Bank that would have knowledge of the loan that came

14  out of Chapter 13.

15         THE COURT:  Well, you have two witnesses left.

16         MR. COLPITTS:  I know.

17         MR. HUDSPETH:  Actually, there's only one witness.

18  This is my client representative.

19         THE COURT:  Okay.  Well --

20         MR. COLPITTS:  I'll call the next M&T witness.

21                SAMANTHA THOMAS, SWORN

22         MR. COLPITTS:  Your Honor, if I may.

23         MR. HUDSPETH:  Make sure you speak up because of your

24  cold.

25         THE WITNESS:  Yeah, okay, sorry.

1               DIRECT EXAMINATION

2  BY MR. COLPITTS:

3  Q.   Will you state your name for the record, please?

4  A.   Yes, Samantha Thomas.

5  Q.   Ms. Thomas, what is your position at M&T Bank?

6  A.   Actually, I work for Bayview Loan Servicing.  I am a

7  litigation manager of default administration.

8  Q.   You're litigation manager?

9  A.   Yes.

10 Q.   What relationship does Bayview has with M&T Bank and this

11 litigation?

12 A.   We component serviced this loan.  We handle --

13 Q.   Well, let's stop right --

14 A.   -- the foreclosure side --

15 Q.   -- there because I don't know what that means.

16 A.   Okay.  I was going to explain.

17 Q.   What does "component service" mean?

18 A.   It means that Bayview Loan Servicing we handle the loan

19 when it's in foreclosure or bankruptcy.  M&T handles the loan

20 when it's current and they're not in default.

21 Q.   So what -- why are you here?

22 A.   I'm here to basically clarify that amount that is in

23 question because it was with Bayview at that time.

24 Q.   Okay.  So you're saying Bayview was the mortgage loan

25 servicer for Mr. Ridley's loan, correct?

1   A.    Correct, because it was in bankruptcy.

2   Q.    And what period of time did Bayview service that loan?

3   A.    It came over from Chase.  I can't recall the exact date,

4   but when it -- they received the loan it was already in

5   bankruptcy.  The loan was already in bankruptcy.

6   Q.    So there are default servicers, right?

7   A.    Yes.

8   Q.    And then there are bankruptcy servicers, right?

9   A.    Well, we're a loan servicing --

10  Q.    Um-hum.

11  A.    For this particular loan we are the default servicer.

12  Q.    Default servicer --

13  A.    Yes.

14  Q.    -- which also --

15  A.    Which handles the foreclosures and bankruptcies for --

16  Q.    Both of them?

17  A.    -- M&T, correct.

18  Q.    Okay.  So are you familiar with Mr. Ridley's loan account?

19  A.    Yes, I am.

20  Q.    How long have you been involved with his loan account?

21  A.    I was assigned his loan last week.

22  Q.    Okay.

23  A.    Thursday.

24  Q.    So what have you reviewed with regard to Mr. Ridley's loan

25  account?

1  A.   I reviewed the note, the mortgage, the payment history,

2  multiple correspondences.  I spoke with bankruptcy department

3  regarding this loan, which they did clarify some of the issues

4  that we faced with this.

5  Q.   And is it M&T Bank that's asked Bayview to come clarify or

6  attempt to clarify these issues?

7  A.   Well, because the loan was with Bayview Loan Servicing --

8  Q.   Um-hum.

9  A.   -- during the bankruptcy, that's why I'm here.

10            MR. COLPITTS:  May I approach the witness, Your

11  Honor?

12            THE COURT:  Sure.

13            MR. COLPITTS:  Show [ph.] some exhibits.

14  BY MR. COLPITTS:

15  Q.   Did -- so at the time this loan was in bankruptcy it was

16  Bayview that would have made any decisions with regard to

17  outside counsel, for example?

18  A.   Yes.

19  Q.   Okay.  Did Bayview hire the law firm of Baer Timberlake

20  Coulson & Cates?

21  A.   Yes, we did.

22  Q.   So anything that was filed in Mr. Ridley's Chapter 13 case

23  by Baer and Timberlake was done on behalf of Bayview?

24  A.   That is correct.

25  Q.   Okay.  And I meant in the context of Baer and Timberlake

1  representing the creditor or the lender on this loan.

2  A.    Correct.

3  Q.    Okay.  And did Baer and Timberlake have authority to file

4  documents on behalf of Bayview in Mr. Ridley's Chapter 13 case?

5  A.    I'm not sure.  I don't know about that.

6  Q.    Well, let's talk specifically.

7  A.    Okay.

8  Q.    Can you turn to Exhibit 5?  Can -- well, this document

9  is -- which has already been admitted is the Notice of Final

10  Cure payment which was filed by the standing Chapter 13

11  Trustee, William Mark Bonney.

12  A.    Correct.

13  Q.    Are you familiar with this document?

14  A.    Yes, I am.

15  Q.    Okay.  What does this document say to you?

16  A.    (No audible response.)

17  Q.    Can I help?

18  A.    That this is a Notice of Final Care.

19  Q.    Yes.

20  A.    And that it was current.

21  Q.    Okay.

22  A.    Yes.

23  Q.    So to clarify, this document says that all -- that

24  Mr. Ridley has completed his Chapter 13 bankruptcy, the Trustee

25  is making his final payments, and that as of those final

1  payments Mr. Ridley is current on his mortgage loan as though

2  no default ever occurred.

3  A.   That is correct.

4  Q.   Okay.  Will you turn to the next exhibit, Number 6?  This

5  is a statement in response to Notice of Final Cure payment.

6  And this document, if you turn to the second page, is signed by

7  Jim Timberlake at Baer Timberlake Coulson Cates, P.C.  And I

8  assume that this is -- well, it says on the first page that the

9  creditor is M&T Bank.  Is that correct?

10 A.   That's correct.

11 Q.   Okay.  And this document says that M&T Bank, Bayview also,

12 right?

13 A.   Correct.

14 Q.   Agrees with the Chapter 13 Trustee's Notice of Final Cure.

15 A.   That is correct.

16 Q.   So again, M&T Bank and Bayview are saying that Mr. Ridley

17 is current on his mortgage loan as though no default ever

18 occurred and his first mort -- post-Chapter 13 mortgage payment

19 is due November 1, 2015.

20 A.   Correct.

21 Q.   You agree with that?

22 A.   Yes.

23 Q.   Okay.  Will you turn to the next exhibit, Number 7?  Can

24 you tell the Court what this is?

25 A.   This is the payment history for M&T Bank.

1  Q.    Have you seen this document before?

2  A.    In review of my business records, yes.

3  Q.    Okay.  Now, this is something that would be generated from

4  the computer system of M&T Bank or Bayview?

5  A.    We share a servicing platform, so --

6  Q.    Okay.  Both entities have access to the same data?

7  A.    Yes.

8  Q.    And this transactional or activity statement covers a

9  period of February 15, 2014, to December 31, 2015.  It's on the

10  first page.  Kind of hard to read, but it's --

11  A.    Yes.

12  Q.    -- about a third of the way down.

13  A.    Yeah.

14  Q.    Okay.  So it covers the last six months, nine months of

15  the Chapter 13 bankruptcy, plus it covers December and November

16  following the bankruptcy.  Would you agree with that?

17  A.    Can you repeat the question?

18  Q.    This -- really what I want to know is this covers the

19  November/December following --

20  A.    Oh, correct.

21  Q.    -- following the completion of the bankruptcy, right?

22  A.    Yes.

23  Q.    Okay.  If you'll quickly look at Exhibit Number 21, which

24  is the check dated October 24, 2015, that Mr. Ridley has

25  already identified.  Do you see that?

1    A.    Yes.

2    Q.    Okay.  And if you will go back to Exhibit Number 7,

3    specifically page 2 -- 7-2 is the exhibit number -- if you go

4    halfway down the page on 7-2 there's an entry at November 2,

5    2015, payment.  Do you see that?

6    A.    Yes, I do.

7    Q.    And the amount is $700.

8    A.    Correct.

9    Q.    Is that a payment -- is that the entry logging in the $700

10   payment that is the October 24th check?

11   A.    Yes.

12   Q.    Okay.  And then if you go four lines above that,

13   December 1, 2015, there's another payment of $700.  Do you see

14   that?

15   A.    What was the date?  I'm sorry.

16   Q.    December 1.

17   A.    Oh, okay.

18   Q.    All right.  Do you see that?

19   A.    Yes.

20   Q.    Okay.  So that is the second payment that Mr. Ridley sent

21   in following his bankruptcy.  Do you agree with that?

22   A.    That's correct.

23   Q.    Okay.  And then if you go back to the first page there's

24   an entry, second line, December 30, 2015, for $700, a payment.

25   That's the third payment sent in by Mr. Ridley.  Do you agree

1  with that?

2  A.   That is correct.

3  Q.   Okay.  So Mr. Ridley testified that he sent in his first

4  payment he sent in and in October was for the November payment.

5  That was the first one he was due for which M&T Bank, Bayview

6  shows receipt of.  Then there's the next payment which is

7  December and then the third one on the first page is January,

8  right?

9  A.   Correct.

10 Q.   Okay.  So as of January 2016 had -- based upon this

11 activity report had Bayview, M&T Bank received three mortgage

12 payments for Mr. Ridley?

13 A.   Yes, but the January is not stated here.

14 Q.   Right.  It stops at December, but we know that he sent in

15 three payments, right?

16 A.   Correct.

17 Q.   And his first payment under the Notice of Final Cure was

18 for November 2015.  So if he sent in three payments that's

19 November, right?  December and January.  Do you agree?

20 A.   Um-hum.

21 Q.   Okay.  So ten minutes ago Mr. Kirsh was up here and said

22 that as of January 2016 M&T Bank's records reflected that

23 Mr. Ridley was delinquent.  Do you recall that?

24 A.   I believe so.

25 Q.   That was not accurate, was it?

 1  A.   Based on his [indiscernible] records and his review,

 2  that's probably -- that's what he saw.

 3  Q.   I'm not calling Mr. Kirsh a liar.

 4  A.   Right.

 5  Q.   I'm saying that --

 6  A.   I can't say what he

 7  Q.   -- the infor -- I'm saying the information he reviewed was

 8  wrong.

 9  A.   I'm not sure if January -- if the borrower sent in the

10  payment for January.  I know that it was a non-sufficient fund

11  check returned --

12  Q.   Well, that was --

13  A.   -- [indiscernible] --

14  Q.   -- actually a year later.

15  A.   All right.

16  Q.   And that was December of 2016.  So M&T's records that

17  moved Mr. Ridley's loan into default status were inaccurate,

18  weren't they?

19           MR. HUDSPETH:  Your Honor, that's been asked and

20  answered --

21           THE WITNESS:  [Indiscernible]

22           THE COURT:  What's that?

23           MR. COLPITTS:  Well, he claims that it's been asked

24  and answered, and I -- it has not.

25           THE COURT:  I'll overrule it.

1              THE WITNESS:  I do see three payments that were made.

2    I'm not sure in his review.

3    BY MR. COLPITTS:

4    Q.   You just don't want to say that the M&T records are

5    inaccurate, do you?

6    A.   Well, I know that there was an amount on the -- the loan

7    that was requested to be removed and those are bankruptcy fees

8    that the foreclosure coordinator did submit once the loan was

9    brought current.

10   Q.   But I have one final question.  Actually, two.  You agree

11   that Mr. Ridley since completion of his Chapter 13 bankruptcy

12   as of December had sent in 2015 three payments.

13   A.   Correct.

14   Q.   Which would cover November, December and January.

15   A.   That is correct.

16   Q.   And if he was current as though no default ever occurred

17   following the Chapter 13 bankruptcy and his first payment was

18   due in November, how could he be delinquent?  He couldn't,

19   could he?

20   A.   That is correct.

21             MR. COLPITTS:  Thank you.  I don't have any further

22   questions.

23             THE COURT:  Ms. Hudspeth.

24             MR. HUDSPETH:  Yes.

25                         CROSS-EXAMINATION

1  BY MR. HUDSPETH:

2  Q.   Ms. Thomas, you mentioned bankruptcy fees being removed.

3  In your review of the records of this loan did you determine

4  that an audit was conducted on this account when it came out of

5  bankruptcy?

6  A.   Yes.

7  Q.   And what did that audit reveal?

8  A.   That the loan was current and the fees that were on the

9  loan -- I can't remember the exact amount -- they were to be

10 removed and placed from recoverable to non-recoverable.

11 Q.   And do the records reflect that that request was actually

12 made?

13 A.   Yes, it does.

14 Q.   But it was not actually implemented, is that correct?

15 A.   Correct.

16 Q.   And do you happen to know why?

17 A.   I don't know why, but it was requested that those amounts

18 from the bankruptcy -- that was a pending amount from

19 bankruptcy.  That was foreclose -- for bankruptcy attorney's

20 fees that were not recoverable.  So the coordinator, he

21 requested that those fees were to be removed.

22 Q.   So -- and this was with Bayview?

23 A.   Yes, that is correct.

24 Q.   So Bayview saw the problem, acknowledged it, made the --

25 took steps to correct it, but for reasons we don't know why, it

1  didn't get corrected?

2  A.   Correct.

3  Q.   But as we stand here today it has been corrected?

4  A.   Yes, it has.

5  Q.   And you've heard the testimony about the various

6  foreclosure fees that are appearing.  Do you happen to know if

7  those are actually bankruptcy fees and/or fees incurred in this

8  litigation?

9  A.   I don't know.

10 Q.   Okay.  But those have -- any of those fees have been

11 cleared, moved and non-recoverable, Mr. Ridley is deemed

12 current and due for his March 1st payment?

13 A.   That is correct.

14 Q.   Even the non-sufficient fund fees for the returned check

15 were cleared, were they not?

16 A.   That is correct.

17           MR. HUDSPETH:  Just a moment, Your Honor.

18                  [Pause in the proceedings.]

19 BY MR. HUDSPETH:

20 Q.   Again, you've heard the testimony about all the

21 foreclosure fees appearing on the billing statements.  To your

22 knowledge Mr. Ridley was not in foreclosure?

23 A.   To my knowledge, no, he was not in foreclosure.

24 Q.   You were aware of bankruptcy fees?

25 A.   Yes.

1  Q.   That were actually incorrectly labeled as foreclosure

2  fees?

3  A.   Correct.

4  Q.   And the only other fees you would be aware of would be

5  fees incurred in this litigation.  Is that correct?

6  A.   That is correct.

7  Q.   So those fees incurred in this litigation do you know if

8  those are deemed recoverable or non-recoverable?

9  A.   I believe that they're recoverable but it would specify

10 the attorney.

11 Q.   But you have taken steps to deem them non-recoverable and

12 wipe them from the loan, correct?

13 A.   That is correct.

14 Q.   And so anything that has been listed on those billing

15 statements as foreclosure fees is most likely fees incurred in

16 this litigation?

17 A.   Correct.

18        MR. HUDSPETH:  I believe that's all, Your Honor.  Oh,

19 I'm sorry.  Just a moment.  I apologize.  That's all, Your

20 Honor.

21        THE COURT:  All right.  Mr. Colpitts, do you have

22 anything else?

23        MR. COLPITTS:  A couple of brief questions.

24                    REDIRECT EXAMINATION

25 BY MR. COLPITTS:

1  Q.   Ms. Thomas, how long -- you said you've been involved in

2  this loan for two weeks?

3  A.   For a week.

4  Q.   One week?

5  A.   Yes.

6  Q.   Why -- I mean, this adversary was filed May 13, 2016, in

7  which we set forth specifically what was -- we believe was

8  going on and raised all of these issues.  Why did it take seven

9  months, eight months for you to become involved?  Who was

10 involved before you?

11 A.   During the bankruptcy?

12 Q.   No, I mean, you have some information regarding this,

13 right?

14 A.   Yes, I do.

15 Q.   And you're the one that's directed that Mr. Ridley's

16 mortgage loan be corrected, right?

17 A.   Did I personally?

18 Q.   Well, you -- did I understand your testimony wrong, you

19 did not direct that the foreclosure fees be removed and all the

20 other charges be removed and --

21 A.   Our legal team.

22 Q.   Your legal team?

23 A.   Yes.

24 Q.   Did they do that within the -- within the last week?

25 A.   I believe December of last year the bankruptcy

1  department -- they've been working on this for a few months

2  prior after the adversary.  December of last year is when they

3  removed the fees.  I can't remember the exact amount, the 800

4  and --

5  Q.   Well, why are -- why is the January and February

6  statements reflecting those charges on there?

7  A.   I don't know.  I don't know.

8  Q.   If you were to receive a mortgage statement that said you

9  owed three times your mortgage payment, would you think that

10 was a joke?

11 A.   No.

12 Q.   Okay.  Would you understand why Mr. Ridley was upset?

13 A.   I can understand why.

14 Q.   Okay.

15 A.   Although he would have contacted somebody at the bank and

16 they would have tried to rectify --

17 Q.   Well, that's what Mr. Ridley testified that he did.

18 A.   Right.

19       MR. COLPITTS:  And it went nowhere.  Thank you.

20       THE COURT:  Anything else?  Mr. Hudspeth, any

21 witness --

22       MR. HUDSPETH:  Just [indiscernible], Your Honor.

23                   RECROSS EXAMINATION

24 BY MR. HUDSPETH:

25 Q.   Tried to clarify the foreclosure attorney fees that

1  appeared on the statements.  Is it your understanding that,

2  again, those were mischaracterized, those were actually

3  litigation fees incurred in here, but mischaracterized as

4  foreclosure attorney fees?

5  A.    That is correct.  The recent ones.

6  Q.    Once it was learned that they were mischaracterized that's

7  when they were properly allocated and then removed?

8  A.    Correct.

9          MR. HUDSPETH:  That's all, Your Honor.

10          THE COURT:  Thank you.

11          THE WITNESS:  Okay.

12          THE COURT:  Mr. Colpitts?

13          MR. COLPITTS:  No further questions, Your Honor, and

14  plaintiff rests.

15          THE COURT:  You rest?

16          MR. HUDSPETH:  May we have a short break before we --

17  my -- I don't -- think I'll only have one witness

18  [indiscernible] we would like to ask [indiscernible] briefly.

19          THE COURT:  Let's take a ten-minute recess.

20          MR. HUDSPETH:  Thank you, Your Honor.

21  (Off the record.)

22          MR. HUDSPETH:  My apologies, Your Honor.  The

23  defendant has no further evidence to present.

24          THE COURT:  Okay.  Mr. Colpitts, do you have any

25  other witnesses you want to call?

1      MR. COLPITTS:  No, we are done.

2      THE COURT:  Okay.  I'm going to -- this is a unique

3  case because it's so fact-driven and I want to hear -- I want

4  the parties to submit to the Court their final argument and any

5  legal argument, too.  I'm going to give you till Friday,

6  March 3rd, which is about two weeks.  Is that manageable to

7  either one of you?

8      MR. COLPITTS:  That's fine with the plaintiff.

9      THE COURT:  Is that fine with plaintiff?

10     MR. HUDSPETH:  And I believe that's plenty of time

11  for me, too, Your Honor.

12     THE COURT:  Okay.  I want it filed by 4:00 o'clock so

13  that way you all do it simultaneously, okay?  And I wanted to

14  thank both of you all for doing such a good job today.  I

15  realize this thing was going to be so fact-driven and because

16  it is.

17     Okay.  So I want your legal argument.  I want this --

18  your argument that you'd ordinarily make and I want your

19  findings of fact and conclusions for offering the Court a road

20  map to what I should put in the Court's order.  A lot of times

21  I just go ahead and draft up an order and wait to receive your

22  all's and set a time to go ahead and draft as part of my order

23  some of the arguments and things that you all have given me, so

24  that is important.

25     So anyway, thank you all for being here and thank you

1  for doing such a good job.

2          MR. COLPITTS:  Thank you, Judge.

3          MR. HUDSPETH:  Thank you, Your Honor.

4          THE COURT:  Okay.  We're excused.  You all are

5  excused.

6  (Proceedings concluded at 11:16 a.m.)

7                          * * * * *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         I certify that the foregoing is a court transcript

2    from an electronic sound recording of the proceedings in the

3    above-entitled matter.

4

5                                    _____

6                                    Ruth Ann Hager, C.E.T.**D-641

7    Dated:   February 21, 2017

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25